## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION

**T.H.,**

    **Plaintiff,**

**v.**                                                            **Case No.: 4:23-cv-274-AW-MAF**

**FLORIDA DEPARTMENT OF CORRECTIONS and RICKY D. DIXON, in his official capacity as SECRETARY OF THE FLORIDA DEPARTMENT OF CORRECTIONS,**

    **Defendants.**

_____/

## DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Defendants, through undersigned counsel, submit the following Response to Plaintiff's Motion for Preliminary Injunction ("Motion"). [Doc. 16].[1]

## Introduction

At its core, the ultimate issue before this Court is whether Plaintiff may override the Florida legislature and the authority granted to the Florida Department of Corrections ("FDC") by requiring FDC to fundamentally change its operations

---

[1] Plaintiff's claim against Dixon in his official capacity is redundant of his claim against FDC, since official capacity claims are simply another way of suing the entity of which the public official is a part. Dixon filed a Motion to Dismiss on this basis. [Doc. 21]. As such, Defendant FDC is the only entity referenced in this Response.

and the educational program provided to inmates throughout Florida. Plaintiff's Complaint, and a complaint filed by FDC in Case No. 4:23-cv-314, present this issue to the Court.

With respect to the Motion, Plaintiff seeks to enforce a Florida Administrative Law Judge's ("ALJ") Final Order that required FDC to (1) provide compensatory education, (2) conduct a comprehensive evaluation, and (3) convene an Individualized Education Plan ("IEP") team meeting to address Plaintiff's academic, emotional, and behavioral needs and consider which curriculum is appropriate for Plaintiff. The Final Order was issued following a due process hearing held under the Individuals with Disabilities Education Act ("IDEA"). As will be addressed *infra*, Plaintiff's Motion is due to be denied.

Plaintiff cannot meet the heavy burden of establishing that the law and the facts are clearly in his favor and that he can satisfy the four-prong test applicable to preliminary injunctions. This is not one of those "rare" occasions for which mandatory or affirmative injunctive relief is appropriate. Plaintiff is not likely, let alone substantially likely, to prevail on his novel claims or make the necessary showing of irreparable harm, requiring this Court deny the Motion.

## Factual and Legal Background

**I.      The Florida Department of Corrections**

Unlike an educational institution or entity, the primary mission of FDC is to protect the public through the incarceration and supervision of offenders and to rehabilitate offenders through the application of work, programs, and services. <u>Fla</u>. <u>Stat</u>. §20.315. With a full understanding of the missions of the Florida Department of Education ("FLDOE") and FDC, the Florida Legislature authorized FDC to establish, operate, and supervise its own unique Correctional Education Program. <u>Fla</u>. <u>Stat</u>. §944.801. FDC is tasked with approving educational programs of the appropriate levels and types in correctional institutions. <u>Id</u>. at subsection (3)(d). This authority extends to the education of all inmates, including those who are under 22 who qualify for special educational services and programs pursuant to the IDEA. 20 U.S.C. §1400 <u>et seq</u>; <u>Id</u>. at subsection (9).

Between 2001 and 2002, the Florida Legislature eliminated the requirement in Sections 944.801(3)(b) and (c), <u>Florida</u> <u>Statutes</u>, that FDC coordinate with the FLDOE to monitor and assess its programming. It also eliminated the requirement that FDC cooperate with FLDOE to develop and complete statistical information. Between 2009 and 2010, the Florida Legislature eliminated the requirement in Section 944.801(3)(f), <u>Florida</u> <u>Statutes</u>, that FDC report its annual activities to FLDOE. Indeed, the Florida Legislature has determined that FDC is its own

educational entity and operates independently from the FLDOE when it comes to establishing, operating, and supervising educational programs within Florida's state correctional institutions.

Importantly, for safety and security reasons, no inmates have access to the World Wide Web while in FDC's custody. [See Declaration of John Becker, Response Exhibit A, ¶4]. Moreover, entering and moving about an FDC Institution involves high levels of security. Id., ¶5. Access to inmates also requires considerable pre-planning where all inmate movements are controlled and monitored to ensure the security of the institution. Id. Even staff must request access to areas of the Institution in advance and must gain entry through an authorized staff member with a designated key. Id.

## II.    Plaintiff

Plaintiff is a 20-year-old adult currently incarcerated in a Florida state correctional institution. [Doc. 1 at pp. 3, 7]. He is a designated sexual predator scheduled for release in 2035. [Doc. 1-2 at p. 6]. He turns 22 in 2025. [Doc. 1 at p. 3]. Plaintiff is a student with Autism Spectrum Disorder eligible to receive services under the IDEA. [Doc. 1 at pp. 32]. He entered FDC's custody in April of 2022. [Doc. 1 at p. 7].

### III.    FDC's Educational Program

FDC offers all prisoners, regardless of disability, two separate mainstream academic classes to those who have not yet attained a regular high school diploma or a GED. [See Declaration of Anna Schubarth, Response Exhibit B, ¶3]. The classes are the in-person Adult Basic Education ("ABE") class designed for students whose TABE scores fall mainly at middle school grade levels and the in-person GED class for students whose TABE scores fall mainly at high school grade levels. Id. Based on his TABE scores, Plaintiff fell in the latter category. Id. Additional services are provided to special education students, such as Plaintiff, based on their individual needs. Id., ¶4. Once a special education student completes his GED requirements, FDC provides additional services through at least the age of 22 based on the student's career goals after receiving a GED. Id.

At all times relevant to the underlying administrative action, Plaintiff received special education and related services pursuant to the IEPs created in May and July 2022, while attending in-person GED classes. Id., ¶7.

Presently, Plaintiff continues to receive the services in his IEP, including his GED course work, in confinement (addressed more fully *infra*). [See Declaration of Kristen Lonergan, Response Exhibit C, ¶11].

## IV.   The Due Process Hearing

### A. Background

The IDEA was created to provide federal assistance to all states that provide children with disabilities a free appropriate public education ("FAPE"). <u>Draper v. Atlanta Indep. Sch. Sys.</u>, 518 F.3d 1275, 1280 (11th Cir. 2008). As a mandatory condition precedent to obtaining judicial review under the IDEA, an aggrieved party must first utilize the IDEA's administrative framework that includes, among other things, the right to an administrative hearing. <u>Id</u>. The appropriate administrative procedure in Florida is to request a due process hearing with an ALJ before the Florida Division of Administrative Hearings ("DOAH"). <u>L.G. ex rel. B.G. v. Sch. Bd. of Palm Beach County</u>, 255 Fed. Appx. 360, 363 (11th Cir. 2007); <u>see also</u> 20 U.S.C. § 1415(f). If a party is dissatisfied with the ALJ's decision, they may file a judicial action to challenge the administrative decision within 90 days. <u>Id</u>. at 363-64; 20 U.S.C. § 1415(i)(2)(A).

### B. The DOAH Case

The instant matter arises from a due process hearing ("DOAH Case") held before DOAH under the IDEA. [Doc. 1 at pp. 8-9]. The DOAH Case was styled <u>T.H. v. Florida Department of Corrections</u>, Case No. 22-3335E. [Doc. 1-2]. In the DOAH Case, Plaintiff alleged that he had been denied FAPE when FDC provided him with educational services leading to the award of a high school equivalency diploma

6

program, as defined in Section 1003.435, Florida Statutes. [Doc. 1-2 at pp. 2, 7].

Plaintiff demanded that FDC provide him with the option to pursue a regular high

school diploma, as that term is defined in Section 1003.4282, Florida Statutes. [Doc.

1-2 at p. 6].

### C. The Final Order

On April 4, 2023, ALJ Jessica E. Varn entered a Final Order wherein she

found FDC committed procedural and substantive violations of the IDEA. [Doc. 1-

2]. As relief, ALJ Varn ordered FDC to:

> 1. Provide compensatory education for the period of May 2022 to April 2023; and
>
> 2. Within 30 days of this Final Order, conduct a comprehensive evaluation of the student, in order to design an IEP tailored to the unique needs of this student; and
>
> 3. Within 45 days of this Final Order, reconvene the IEP team, which must include behavior specialists and a mental health professional, to address all of this student's academic, emotional, and behavioral needs and consider which curriculum is appropriate for this student.

[Doc. 1-2 at p. 17]. All other forms of relief demanded by Plaintiff were denied.

[Doc. 1-2 at p. 17].

With respect to compensatory education, contrary to Plaintiff's position, the

Final Order does not mandate that compensatory education be provided on or before

any specific date. Regarding the final two forms of relief (conducting a

comprehensive evaluation[2] and convening an IEP team meeting), the Final Order

requires that each be implemented several weeks before the 90-day deadline for FDC

to challenge the Final Order. [Doc. 1-2 at p. 17]. Importantly, the Final Order does

not require FDC to provide Plaintiff with a regular high school curriculum. Instead,

the Final Order merely requires that FDC reconvene an IEP team to "consider which

curriculum is appropriate." [Doc. 1-2 at p. 17].

### D. FDC's Implementation of the Final Order

To date, FDC has not provided compensatory services to Plaintiff.

Although FDC ultimately disputes that Plaintiff is entitled to any of the relief

in the Final Order, FDC timely proceeded with conducting and completing a

"comprehensive evaluation." As reflected in Anna Schubarth's Declaration

accompanying this response, FDC scheduled an IEP team meeting on April 23,

2023, just 19 days after the Final Order was entered, to discuss the evaluations to be

conducted by FDC to guide the IEP team. [See Exhibit B, ¶8]. FDC completed the

following evaluations by May 5, 2023:

> (1)    cognitive, academic, and adaptive assessments (including
>         Behavior Assessment System for Children, 3rd Edition; The
>         Financial Literacy Inventory; The Standardized Mini-Mental
>         State Examination; the Kaufman Brief Intelligence Test; and, the
>         Wide Range Achievement Test);

---

[2] The Final Order does not specify what must be included in the "comprehensive
evaluation."

(2)    a speech and language evaluation; and,

(3)    an occupational therapy evaluation.

Id., ¶¶9-11.

The occupational therapy evaluation addressed Plaintiff's primary occupational therapy challenge in the education setting, *i.e.*, hand strength. [See Exhibit B, ¶13]. At the May 19, 2023, IEP Team meeting, Plaintiff's advocate indicated that she believed the evaluation needed an additional component - an in-person assessment. Id. While FDC agreed to complete this additional assessment, FDC did not agree with or concede that the May 5 occupational evaluation completed by the occupational therapist was inadequate. Id. This additional assessment has not yet occurred due to Plaintiff's pending transfer to a Close Management Institution due to various offenses including a drug trafficking offense on April 17. [See Exhibit A, ¶¶6-9; see also Exhibit B, ¶13]. Nonetheless, Plaintiff continues to receive occupational therapy consistent with his original IEP and is improving his hand strength and/or handwriting issues despite the temporary delay in completing Plaintiff's advocate's requested additional assessment related to the completed May 5 occupational therapy evaluation. See Exhibit C, ¶12.

FDC complied with the Final Order by reconvening an IEP team meeting within 45 days "to address all of this student's academic, emotional, and behavioral needs and consider which curriculum is appropriate for this student." Specifically,

FDC convened two IEP team meetings within the 45-day deadline (May 17 and 19, 2023) that lasted several hours. [See Exhibit B, ¶¶14, 16]. Collectively, at the meetings, the IEP team discussed all facets of Plaintiff's education, including his academic, emotional, and behavioral needs and which curriculum is appropriate for Plaintiff. Id., ¶14.

Following an IEP on May 19, 2023, FDC personnel received confirmation that Plaintiff's counsel had organized a meeting for the parties with FLDOE to obtain additional information on programs with which FLDOE was familiar and which may assist in exploring options for Plaintiff going forward. [See Exhibit C, ¶4\. FLDOE representative Jessica Brattain responded via email confirming the June 15 date and subsequently provided a virtual meeting link for a June 15 meeting at 11:00 a.m. Id., ¶5. FDC's understanding leading up to that meeting was that both parties would be in attendance to receive information from FLDOE. Id., ¶6.

On June 15 at 11:00 a.m., FDC legal counsel logged into the virtual meeting and discovered that Plaintiff's counsel was not in attendance. Id., ¶8. FLDOE staff informed FDC that they intended to conduct a meeting with FDC personnel and then a separate meeting with Plaintiff's counsel later that same day. Id. At no time prior to the June 15 meeting with FLDOE did FDC legal counsel believe that it would be meeting without Plaintiff's counsel present. Id. FDC always contemplated that the

meeting would be held jointly with FLDOE and no one from FLDOE or Disability Rights Florida communicated anything different. Id.

Upon being informed that FDC had decided to pursue its additional legal remedies and intended to file an action in circuit court challenging the Final Order, FLDOE staff asserted that the meeting would not go forward and that they would inform Plaintiff's counsel of such. Id., ¶9. At no time did FDC staff make any determination regarding whether Disability Rights Florida and FLDOE would continue to hold the June 15 virtual meeting. Id.

At the end of the day, while the IEP teams discussed curriculum options for Plaintiff at the May meetings, FDC members of the IEP team agreed that the GED program option offered Plaintiff a FAPE. [See Exhibit B, ¶15]. Conversely, Plaintiff and his advocates were unwilling to consider the GED program, and Plaintiff "reiterated that GED prep is not appropriate for him…" [Doc. 16 at p. 12].

A third IEP team meeting was scheduled for June 16, 2023. [Doc. 1 at p. 12]. FDC does not dispute that it cancelled the IEP team meeting scheduled for June 16, 2023, because FDC determined that it would be pursuing legal remedies to challenge the Order. [See Exhibit C, ¶10].

**Argument and Authority**

I.    **Mandatory or Affirmative Preliminary Injunction Standard**

As this Court is aware, preliminary injunctive relief is an extraordinary remedy. Wreal, LLC v. Amazon.com, Inc., 840 F.3d 1244, 1247 (11th Cir. 2016). Through his Motion, Plaintiff requests that within 14 days, this Court order FDC to "start providing him compensatory education, complete his comprehensive evaluation, and develop and finalize a legally compliant IEP." [Doc. 16 at p. 2]. As it relates to Plaintiff's demand that the Court order FDC to "finalize a legally compliant IEP," what he essentially asks is that this Court change the *status quo* and make FDC change its entire educational program and provide him with an opportunity to earn a regular high school diploma *on a temporary basis*. To provide the relief requested by Plaintiff, this Court would need to disregard the IDEA by changing Plaintiff's educational placement during the pendency of this action. Specifically, Plaintiff's current IEP provides that he will work toward a GED, which he has done since May 6, 2022. [Doc. 1-2 at p. 6]. Thus, Plaintiff is requesting the issuance of a "mandatory or affirmative injunction" which exacts an even heavier burden. See, Teel v. Aaron's, Inc., Case No. 3:14-CV-640-J-32PDB, 2015 WL 1346846, at *3 (M.D. Fla. Mar. 24, 2015).

To obtain a "mandatory or affirmative injunction," Plaintiff must prove that "the facts and law are clearly in [his] favor…" Haddad v. Arnold, 784 F. Supp. 2d

1284, 1295 (M.D. Fla. 2010). Issuance of such an injunction is considered rare. Martinez v. Mathews, 544 F.2d 1233, 1243 (5th Cir. 1976)("Mandatory preliminary relief…is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party…"); Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp., 441 F.2d 560, 561-562 (5th Cir. 1971)(describing a movant's burden as "heavy").[3]

Aside from a mandatory or affirmative injunction, "[a] plaintiff moving for a preliminary injunction must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the plaintiff outweighs the injury to the nonmovant; and (4) that the injunction would not disserve the public interest." Statewide Detective Agency v. Miller, 115 F.3d 904, 905 (11th Cir. 1997). The test established by the Eleventh Circuit requires the moving party "clearly establish" the burden of persuasion as to each of the four elements. Accord, Siegel v. LePore, 234 F. 3d 1163, 1176 (11th Cir. 2000) (internal citations omitted).

## II.   There is No Substantial Threat of Irreparable Harm

Binding precedent is clear that if there is no substantial threat of irreparable harm, no further analysis is required. Northeastern Fla. Chapter of Ass'n of Gen.

---

[3] The Eleventh Circuit in Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981) adopted as binding precedent all decisions of the Fifth Circuit as of the close of business on September 30, 1981.

Contractors v. City of Jacksonville, 896 F.2d 1283, 1285 (11th Cir. 1990); Siegel, 234 F.3d at 1176 ("Significantly, even if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper") (internal citations omitted). The mere possibility of injury to Plaintiff is not enough to satisfy this threshold element; rather, Plaintiff must prove that there is a substantial likelihood of an actual and imminent irreparable injury.

### A. Plaintiff's Harm is Speculative and Exaggerated

To show irreparable harm, Plaintiff argues that he "will soon age out of IDEA services." [Doc. 16 at p. 24]. Aside from the fact that Plaintiff does not turn 22 for more than 18 months, which hardly suggests his injury is "imminent," Plaintiff's focus on his age 22 birthday is a red herring. Case law is clear that compensatory education can be provided beyond the age of 22, because it is judicially constructed relief designed to remedy past educational failings for students. See MP v. Florida Dept. of Corrections, 4:06cv52-WS, 2006 WL 8444714, at *2 (N.D. Fla. Oct. 12, 2006); See also Jefferson County Bd. of Educ. v. Breen, 853 F.2d 853, 857-58 (11th Cir. 1988) (upholding the district court's order requiring the defendant to fund an additional two years of educational services beyond the plaintiff's twenty-first birthday); Pihl v. Massachusetts Dept. of Edu., 9 F.3d 184 (1st Cir. 1993)(holding that the IDEA empowers courts to grant remedy in the form of compensatory

education to disabled students beyond the statutory age of entitlement for special education services).  Moreover, Plaintiff's scheduled release date from prison is not until 2035. This leaves more than sufficient time for FDC to provide compensatory educational services to Plaintiff if he ultimately prevails, including the four credits he needs to earn a regular high school diploma. [Doc. 1 at p. 7].

Plaintiff's reliance on J.B. v. Killingly Board of Education, 990 F. Supp 57 (D. Conn. 1997), is misplaced. While the court in J.B. granted a preliminary injunction requiring the educational agency to provide compensatory transition services during the pendency of the case, the facts at issue in J.B., and other grounds supporting the existence of irreparable harm, vary greatly from the matter before this Court. In J.B., as part of his irreparable harm argument, the student asserted that continued placement in his institutional residential setting, as opposed to a community-based residential treatment program, would "exacerbate his disability because [the institutional residential setting] does not have the facilities to treat his emotional needs and to prepare him for community living." Id. at 71. On this issue, the Court found that a change in placement (overriding stay-put) was necessary, because "he poses a danger to himself and the community [at the institutional residential setting] due to the nature of his disabilities." Id. at 73. Unlike J.B., aside from Plaintiff being an inmate in prison, there is no evidence before this Court to demonstrate that his disability will be aggravated if an injunction is not entered or

that compensatory education and a pathway to completing his remaining four credits cannot be provided prior to his scheduled release date in 12 years (2035).

**B.  *Plaintiff's Delay in Seeking Injunctive Relief Warrants Denial of his Motion***

The Court's inquiry into Plaintiff's alleged irreparable harm must also include consideration of Plaintiff's delay in seeking injunctive relief. <u>Bar-Navon v. Sch. Bd. of Brevard County, Fla.</u>, 6:06-CV-1434-ORL-19-KRS, 2007 WL 121342, at *5 (M.D. Fla. Jan. 11, 2007). Plaintiff and his IEP team agreed on May 6, 2022, to change the distance-learning high school diploma option to FDC's in-person GED classroom. [Doc. 1-2 at p. 6]. Plaintiff waited more than 5 months to file a due process complaint (October 28, 2022) to challenge his own decision and that of the rest of the IEP team. [Doc. 1-2]. It can hardly be considered "irreparable harm" to require that the *status quo* (i.e. current educational placement) previously agreed upon by Plaintiff be maintained during the pendency of this action.

Moreover, as it relates to the Final Order, FDC was required to complete its comprehensive evaluation by May 4, 2023, and to reconvene an IEP team meeting by (May 19, 2023). Importantly, Plaintiff has been represented since at least October 28, 2022, by multiple attorneys employed with Disability Rights Florida, which holds itself out as "Florida's Protection and Advocacy System" that "is specifically authorized to pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of individuals

16

with disabilities." [Doc. 1 at p. 11, n. 1; Doc. 1-2 at p. 2]. Nonetheless, Plaintiff did not seek injunctive relief for FDC's alleged failure to adhere to the deadlines in the Final Order until July 31, 2023. [Doc. 16]. In sum, Plaintiff delayed seeking injunctive relief for **88 days** as it relates to the 30-day comprehensive evaluation deadline (May 4, 2023) and **73 days** with respect to the 45-day IEP team meeting deadline (May 19, 2023). Such a delay warrants denial of the Motion. See Wreal, LLC, 840 F.3d at 1248 ("A delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm"). See also InVue Sec. Products Inc. v. Vanguard Products Group, Inc., 8:18-CV-2548-T-33SPF, 2019 WL 4671143, at *6 (M.D. Fla. July 1, 2019), report and recommendation adopted, 8:18-CV-2548-T-33SPF, 2019 WL 4673755 (M.D. Fla. Aug. 15, 2019)("it is not uncommon for courts to deny a preliminary injunction in the face of unexplained delays of more than two months").

### III.    Plaintiff Cannot Demonstrate a Substantial Likelihood of Success on his Claims Under Section 1983 and the IDEA

#### A. Plaintiff is Unable to Establish that he Exhausted Administrative Remedies Under the Prison Litigation Reform Act

Plaintiff failed to exhaust his administrative remedies against the Defendants. Pursuant to 42 U.S.C. § 1997e(a):

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

17

This requirement is mandatory. <u>Alexander v. Hawk</u>, 159 F.3d 1321, 1323 (11th Cir.1998); <u>Harper v. Jenkin</u>, 179 F.3d 1311 (11th Cir. 1999). Section § 1997e(a) requires the plaintiff to exhaust any available administrative remedy *before* he files suit. <u>Smith v. Terry</u>, 491 Fed.Appx 81, 83 (11th Cir. 2012) (unreported op.); <u>Cox v. Mayer</u>, 332 F.3d 422, 425 (6th Cir. 2003).[4]  In <u>Porter v. Nussle</u>, 534 U.S. 516, 532, 122 S. Ct. 983 (2002), the United States Supreme Court held that 42 U.S.C. §1997e(a) applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.  Exhaustion is required whether the Plaintiff seeks declaratory and injunctive relief, monetary damages, or both. <u>Booth v. Churner</u>, 532 U.S. 731, 734, 121 S. Ct. 1819 (2001); <u>Alexander</u>, 159 F.3d at 1325.  The requirement is not subject to either waiver by a court, or futility or inadequacy exceptions. <u>See Alexander</u>, 159 F.3d at 1325; <u>see also</u> <u>Booth</u>, 532 U.S. at 741 n.6.

"The [Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e,] exhaustion requirement requires full and proper exhaustion." <u>See</u> <u>Woodford v. Ngo</u>, 548 U.S. 81, 93, 126 S. Ct. 2378 (2006).  Exhaustion is a *mandatory* pre-condition to filing a suit. <u>Woodford</u>, 548 U.S. at 85.  Completion of the grievance exhaustion

---

[4] The Sixth Circuit in <u>Cox</u> cited to <u>Harris v. Garner,</u> 216 F.3d 970, 973-80 (11th Cir. 2000) (en banc), "[f]or an extended explanation of why 'to bring' means 'to file,'" where the Eleventh Circuit construed the same language ("brought") in the physical injury section of § 1997e to mean "file."  <u>Cox</u>, 332 F.3d at 424 n.1.

requirement means properly completing each step of the prison's grievance procedures.  Jones v. Bock, 549 U.S. 199, 219, 127 S.Ct. 910 (2007); Johnson v. Meadows, 418 F.3d 1152, 1158 (11th Cir. 2005); Zolicoffer v. Scott, 55 F. Supp. 2d 1372, 1375 (N.D. Ga. 1999) ("The exhaustion requirement mandates a good faith, bona fide effort to comply with [the grievance] procedures for obtaining an administrative remedy."), affirmed, 252 F.3d 440 (11th Cir. 2001).

The Eleventh Circuit Court of Appeal has noted that the policy reasons underlying the requirement of exhaustion are:

> (1) to avoid premature interruption of the administrative process; (2) to let the agency develop the necessary factual background upon which decisions should be based; (3) to permit the agency to exercise its discretion or apply its expertise; (4) to improve the efficiency of the administrative process; (5) to conserve scarce judicial resources, since the complaining party may be successful in vindicating rights in the administrative process and the courts may never have to intervene; (6) to give the agency a chance to discover and correct its own errors; and (7) to avoid the possibility that "frequent and deliberate flouting of the administrative processes could weaken the effectiveness of an agency by encouraging people to ignore its procedures.

Alexander, 159 F.3d at 1327 (quoting Kobleur v. Group Hospitalization & Medical Services, Inc., 954 F.2d 705, 712 (11th Cir. 1992)).  The Eleventh Circuit has also stated that the purpose of exhaustion "is to put the [administrative authority] on notice of **all issues** in contention and to allow the [authority] an opportunity to investigate those issues." Chandler v. Crosby, 379 F.3d 1278, 1287 (11th Cir. 2004)

(citations omitted).  The purpose of filing administrative grievances, as defined by the FDC inmate grievance procedure,

> . . . is to provide an inmate with a channel for the administrative settlement of a grievance.  In addition to providing the inmate with the opportunity of having a grievance heard and considered, this procedure will assist the department by providing additional means for internal resolution of problems and improving lines of communication.  This procedure will also provide a written record in the event of subsequent judicial or administrative review.

Rule 33-103.001(1), Fla. Admin. Code.  "The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance.  The prison grievance system will not have such an opportunity unless the grievant complies with the system's procedural rules."  Woodford, 548 U.S. at 95.  *"Allowing plaintiff to proceed on his unexhausted claim would frustrate the policies behind the mandatory PLRA exhaustion requirement."*  Shields v. Paeplow, No. 09-21818-Civ-SEITZ, 2010 WL 5419002, at *7 (S.D. Fla. Nov. 16, 2010) (report and recommendation ("R&R") citing Woodford, 548 U.S. at 87-94), 2010 WL 5419081 (Dec. 23, 2010) (unpublished order adopting R&R) (emphasis added).

According to precedent, all claims must be exhausted prior to filing a lawsuit.  See Jones, 549 U.S. at 219-24.  The District Court is tasked with separating the exhausted claims from the unexhausted claims, dismissing the unexhausted claims, and proceeding forward on only the exhausted claims.  Id.

FDC has established a grievance procedure in the Florida Administrative Code, §§ 33-103.001 to 33-103.019. Chandler, 379 F.3d at 1288. Generally, to properly exhaust administrative remedies, prisoners must complete a three-step process[5] starting with an informal grievance on a DC6-236 form, followed by a formal grievance on a DC1-303 form, and completed by the submission of a grievance appeal on DC1-303 form. See Rules 33-103.005-.007, F.A.C. The informal and formal grievances are institutional grievances, meaning they are filed at the prison the prisoner is housed at for a response by a prison staff member. Id.; Chandler, 379 F.3d at 1287-88. Exhaustion requires that all steps within the grievance process be completed before filing suit, including waiting for a response to the grievance appeal before initiating the judicial action. See, e.g., Smith, 491 F. App'x at 82-83 (stating that, to complete the exhaustion requirement, the inmate was required to wait for the grievance appeal response or for the requisite appeal response time to expire before filing his § 1983 action).

In Turner v. Burnside, 541 F.3d 1077 (11th Cir. 2008), the Eleventh Circuit held that "a defense of failure to properly exhaust available administrative remedies under the PLRA should be treated as a matter in abatement." Id. at 1082 (citing

---

[5] Inmates are permitted to begin at the second step of this process for claims regarding violations of the Americans with Disabilities Act. See Rule 33-103.005(1), F.A.C. As will be described below, however, this has no effect on the analysis as applied to Plaintiff's claims.

Bryant v. Rich, 530 F.3d 1368, 1374 (11th Cir. 2008) (holding that "instances exist-such as those involving jurisdictional issues when judges may resolve factual questions.  One such instance is when a judge must decide a motion to dismiss for failure to exhaust nonjudicial remedies.").  "Because exhaustion of administrative remedies is a matter in abatement and not generally an adjudication on the merits, an exhaustion defense … is not ordinarily the proper subject for a summary judgment; instead, it 'should be raised in a motion to dismiss or be treated as such if raised in a motion for summary judgment.'" Bryant, 530 F.3d at 1374-1375 (citing Ritza v. Int'l Longshoremen's & Warehousemen's Union, 837 F.2d 365, 368-69 (9th Cir. 1988)).

Here, Plaintiff entered the custody of FDC in April of 2022.  [Doc. 1 at ¶ 34].  Between that time and the filing of this action, Plaintiff has not filed any grievance at any level of the grievance procedure regarding the issues he raises about his education. [See Declarations of Ashley Stokes and Christina Crews, Response Exhibits D and E].

Consequently, Plaintiff did not even attempt to engage, let alone exhaust, his administrative grievance remedies. Thus, Plaintiff's Complaint must be dismissed due to lack of exhaustion of administrative remedies. As such, he is not substantially likely to prevail on his Section 1983 and IDEA claims. At this point, his deficiency with this case *cannot be cured by filing an amended complaint* because the

amendment cannot "change the important historical fact: his administrative remedies were unexhausted when he filed his original complaint." Smith, 491 F. App'x at 83.

In sum, Plaintiff is unable to demonstrate that he exhausted remedies under the PLRA, thereby mandating denial of his Motion. See Swain v. Junior, 961 F.3d 1276, 1292 (11th Cir. 2020)("The district court also erred in refusing to consider the defendants' arguments with respect to PLRA exhaustion…[a]ccordingly, the plaintiffs could show a substantial likelihood of success on the merits only if the defendants were unlikely to demonstrate a lack of PLRA exhaustion.").

### B. Plaintiff's Section 1983 Claim is Barred

As this Court is aware, 42 U.S.C. §1983 creates no substantive rights but merely provides a remedy for deprivations of federal statutory and constitutional rights. Shi v. Montgomery, 679 Fed.Appx. 828, 834 (11th Cir. 2017)(internal citations omitted). In this action, Plaintiff seeks to use Section 1983 as a vehicle "to enforce favorable administrative orders addressing his federal right to FAPE." [Doc. 1 at p. 15]. However, binding case law makes clear that Section 1983 actions for denial of rights conferred by the IDEA are barred, because the IDEA's comprehensive enforcement scheme provides the sole remedy for statutory violations. See K.A. ex rel. F.A. v. Fulton County School Dist., 741 F. 3d 1195, 1210 (11th Cir. 2013); see also Sch. Bd. of Manatee Cnty., Fla. v. L.H. ex rel. D.H., 666 F. Supp.2d 1285, 1297 (M.D. Fla. 2009)("Similarly, L.H's parents have alleged only

violations of the IDEA as the basis for their § 1983 claim. Moreover, the violation of L.H.'s or the parents' rights for which they seek redress pursuant to § 1983 are subsumed by the School Board's appeal and will be determined after the Court makes a ruling on the merits of the School Board's claims. Accordingly, the parents have failed to state a claim upon which relief can be granted. Thus, the motion to dismiss should be granted as to Count IV").

### C. FDC is Not Required to Provide Compensatory Education by a Date Certain

The award of compensatory education contained in the Final Order did not direct FDC to initiate and/or complete delivery of educational services by a date certain. Unlike the provisions of the Final Order directing FDC to conduct a comprehensive evaluation and reconvene an IEP meeting, where the ALJ showed the ability and inclination to include specific time frames, the compensatory education award is silent as to timing of performance. Thus, Plaintiff's immediate demand for an award of compensatory education exceeds the relief afforded by the ALJ.

### D. FDC Completed the Comprehensive Evaluation and Reconvened an IEP Team Meeting within 45 Days

As was addressed *supra*, FDC completed the comprehensive evaluation and reconvened *two* IEP team meetings under the parameters of the Final Order. Regarding the IEP team meeting, despite Plaintiff's suggestion otherwise, nothing

24

in ALJ Varn's Final Order requires that FDC provide Plaintiff with an amended IEP within 45 days of the Order.

### E.  FDC is Not Legally Required to Provide Disabled Adult Inmates with a Pathway to Earning a Regular High School Diploma

As this Court is aware, before Plaintiff filed his Complaint, FDC filed an action against Plaintiff seeking judicial review of the entirety of the Final Order. [Doc. 17]. While Plaintiff understandably cabins his "substantially likely to prevail" argument on whether FDC implemented the Final Order, he still makes clear that he seeks to have this Court order FDC to provide him with an opportunity to obtain a regular high school diploma. See Doc. 16 at p. 12 ("the team shared that its blanket policy of offering only GED prep is still in effect—despite the Final Order directing [FDC] to determine T.H.'s educational program based on his unique needs"); Doc. 16 at p. 12 ("T.H. reiterated that GED prep is not appropriate for him…"); Doc. 16 at p. 15 ("Because [FDC] has not complied with the order…[i]t harms not only his educational progress but also his opportunity to obtain a high school diploma").

Thus, when considering whether Plaintiff is substantially likely to prevail on his claim, the Court must also consider the merits of FDC's position that ALJ Varn erred in determining that FDC is required to provide inmates with a pathway to a regular high school diploma.[6]

---

[6] To be clear, the entirety of FDC's argument supporting the vacation of ALJ Varn's Final Order is not included herein.

Under the IDEA, correctional institutions are required to provide FAPE to children convicted as adults and incarcerated in adult prisons, albeit with exceptions. 20 U.S.C. §1414(d)(7). Moreover, the obligation to make FAPE available to all children with disabilities does not apply with respect to children aged 3, 4, 5, 18, 19, 20, or 21 in a State to the extent that its application to those children would be inconsistent with State law or practice, or the order of any court, respecting the provision of public education to children of those ages. 20 U.S.C. §1412(1)(A) and (B)(emphasis added). IDEA regulations further recognize the limitations on providing FAPE above. See 34 C.F.R. §300.102.

Florida law requires that FAPE be provided *by school districts* to students with disabilities aged 18 through 21. See F.S. §1003.57. Florida law also requires that all school districts offer a program that includes a pathway to standard high school diploma, including for students with disabilities. F.S. §1003.4282. As it pertains to criminal offenders, Florida law mandates that educational programs be provided by FDC to "youthful offenders" and adult prisoners.[7]

---

[7] Plaintiff is not considered a "youthful offender" under F.S. §958.045; rather, he is a prisoner under F.S. §944.801.

With respect to adult prisoners, the Florida Legislature vested authority in FDC to manage and operate the Correctional Education Program to be provided to prisoners consistent with F.S. §944.801. Nothing in F.S. §944.801 requires that FDC provide prisoners with a pathway to earning a regular high school diploma. In fact, the statute expressly references high school equivalency diplomas and vocational certificates. F.S. §944.801(2)(g) and (j).

FDC offers all inmates, regardless of disability, the option to obtain a GED through general education diploma coursework. [See Exhibit B, ¶3]. GED course training, supervision, and materials are provided at public expense and without charge to students with an IEP. Id. Upon receiving a GED, a student may also qualify for a State of Florida High School Diploma issued by the Commissioner of Education. See Rule 6A-6.0201, F.A.C.  This Court's holding in MP, 2008 WL 4525134 at *1, supports FDC's program.

In MP, an adult inmate filed a due process proceeding under the IDEA against FL DOE and FDC. Id. At the time of the lawsuit, MP had already earned his GED. Id. Ultimately, the Court affirmed summary judgment in favor of FL DOE and FDC, finding that MP was no longer eligible for special education services under the IDEA, because he earned a GED which, at the time, was a high school equivalency diploma. Id. MP also recognized that "Florida law provides that adults in state correctional facilities receive adult basic instruction targeted toward achievement of

27

a GED. Fla. Stat. § 944.801." As a result, the Court noted that "the administrative law judge correctly found that MP completed his secondary education when he received his GED and was therefore not entitled to additional special education services." Id. Importantly, the Court in MP recognized that at the time of its opinion (2008), the then-current IDEA regulations (34 C.F.R. §300.102) did not equate a GED to a high school equivalency diploma, but they took effect after MP filed suit. Id. Because IDEA regulations do not apply retroactively, MP was unsuccessful. Subsequent to MP, in 2014, F.S. §944.801 was revised to remove "general educational development (GED) certificates" and replace the term with "high school equivalency diploma."

Currently, under Florida law, a high school equivalency diploma has "equal status with other high school diplomas for all state purposes, including admission to any state university or Florida College System institution." F.S. §1003.435(6). Thus, in Florida, a GED is still considered a "high school equivalency diploma." Had the Florida Legislature desired to require that FDC provide adult prisoners (disabled and non-disabled) with the opportunity to earn a "regular high school diploma," as opposed to a "high school equivalency diploma," it could have done so. Thus, in accordance with 20 U.S.C. §1412(a)(1)(B)(i), FDC prisoners aged 18 to 21 years old are not entitled to regular high school diploma instruction as Florida law and practice do not require it.

Based on the foregoing, Plaintiff is not substantially likely to prevail on the matters at issue in this litigation.

### F. Plaintiff Abandoned Any Argument that he is Substantially Likely to Prevail on Counts III and IV of the Complaint

Counts III and IV of the Complaint assert claims that FDC violated the ADA and Section 504. [Doc. 1 at pp. 16-18]. However, Plaintiff's Motion does not address these claims. Thus, Plaintiff has waived any argument that he is substantially likely to prevail on Counts III and IV.

### G. Plaintiff's Complaint is Subject to Dismissal

Finally, this case is unlikely to even proceed to an adjudication on the merits. On August 15, 2023, Defendants filed a Consolidated Motion to Dismiss Plaintiff's Complaint and Supporting Memorandum of Law. [Doc. 21]. Based on the arguments presented in Defendant's Motion to Dismiss which, for the sake of brevity, are not restated in their entirety herein, Plaintiff's Complaint is subject to dismissal thereby warranting the denial of his request for temporary injunctive relief.

### IV.    The Injury to Defendants Significantly Outweighs the Speculative Injury to Plaintiff (i.e. Balance of Harms) and the Entry of an Injunction would Disserve the Public Interest

The final two elements of this Court's analysis-balancing of harms and consideration of public interest-are intertwined and best considered together.

The relief sought by Plaintiff is not to maintain the *status quo*, which is the "chief function" of a preliminary injunction. Crucially, the Final Order does not

constitute a change in placement; rather, it requires FDC to provide an unspecified form of "compensatory education" with no date certain, provide a comprehensive evaluation, and reconvene an IEP team meeting to discuss the appropriate curriculum for Plaintiff. Since no change of placement was ordered in the Final Order, an injunction is inappropriate. See DeKalb County Sch. Dist. v. J.W.M., 445 F.Supp.2d 1371, 1376 (N.D. Ga. 2006) (holding, "…the issue is whether, during the pendency of the appeal, the Court should order enforcement of provisions of the ALJ's decision that do not order a change of W.M.'s placement. The Court finds that it should not."); see also J.D. v. Manatee Cnty. Sch. Bd., 340 F.Supp.2d 1316, 1319–20 (M.D. Fla. 2004)(denying student's motion for preliminary injunction and reasoning, "[a]bsent a decision by the ALJ that a change in placement is appropriate, the plain language of the IDEA and the Code of Federal Regulations require that TDF "remain in [his] then-current educational placement", which is his regular classroom. Accordingly, the Board is not obligated to provide TDF with an IEP while it appeals the ALJ's decision").

If the Court grants Plaintiff's Motion, FDC will be required to change Plaintiff's placement by providing him with a pathway to a regular high school diploma. Such a decision will fundamentally alter the nature of the services provided by FDC and override the safety and security concerns raised by FDC in the underlying due process case as well as Plaintiff's October 2022 sexual and April

2023 drug offenses while in FDC's custody. [See Exhibit A, ¶¶6-9]. Indeed, the public interest would not be served by overriding FDC's legitimate safety and security concerns relating to Plaintiff's trafficking in amphetamines and need to be placed in Close Management II housing. Id. By way of example, Plaintiff will be placed in Close Management II housing at a different facility based on his recent actions. Aside from not delivering the curriculum demanded by Plaintiff to its inmates in regular housing situations, an injunction requiring FDC to alter its staffing and security plans for Close Management II to temporarily educate Plaintiff under his desired curriculum does not serve the public interest – including the safety of other inmates and FDC personnel. As another example, Plaintiff was recently found in possession of amphetamines. If Plaintiff's desired curriculum through an injunction necessitates correspondence to/from Plaintiff and an outside educational provider, it increases the opportunity for further distribution of prohibited materials. Finally, access to inmates requires considerable pre-planning for safety and security purposes. Any benefit to Plaintiff in receiving his desired educational services on a temporary basis is outweighed by the safety and security risks inherent with implementing an entirely new educational program in Close Management II.

If the Court denies Plaintiff's Motion, FDC will continue providing Plaintiff with a pathway to a GED. This would maintain the *status quo* until the trial on the merits. GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Engineers, 38 F.Supp.3d

1365, 1379 (N.D. Ga. 2014), aff'd, 788 F.3d 1318 (11th Cir. 2015)("While the Court in no way means to downplay the importance of protecting individual rights, given the relatively uncertain nature of Second Amendment rights and the fact that the status quo is, and has been for some time, the continued enforcement of the Firearms Regulation, such a temporary setback to Plaintiffs' firearms use is relatively minor."); Black Warrior Riverkeeper, Inc. v. Alabama Dept. of Transp., Case No. 2:11-CV-267-WKW, 2014 WL 200578 at *8, 78 (M.D. Ala. Jan. 17, 2014)(Injunctive relief may not be proper "when it would harm the public interest, even if doing so would cause irreparable injury to the movant"); Yakus v. U.S., 321 U.S. 414, 440 (1944)("where an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff"). Moreover, as noted *supra*, Plaintiff is not scheduled for release until 2035. If the Motion is denied and Plaintiff ultimately prevails in this matter and in FDC's companion case challenging the Final Order, the relief he seeks can be provided.

Finally, with respect to compensatory education, it is in the public interest to avoid the unnecessary expenditure of government funds. Indeed, requiring FDC to outlay the time and resources to create an entirely new education program, when the

Final Order at issue may be vacated, would be a tremendous waste of government resources and costs. See D.C. v. Masucci, 13 F.Supp.3d 33, 42 (D.D.C. 2014)(granting stay of compensatory education award because, in part, there is a public interest in keeping government costs minimized).

### Conclusion

Based on the foregoing, Plaintiff's Motion must be denied. Alternatively, if deemed appropriate by the Court, FDC submits that a stay of the Final Order (despite it containing no change in placement) is warranted for the same reasons Plaintiff's Motion is due to be denied.

Dated this 15th day of August, 2023.

Respectfully submitted,

*/s/ Amy J. Pitsch*
**AMY J. PITSCH**
Florida Bar No.: 0338280
E-mail: apitsch@sniffenlaw.com
*/s/ Terry J. Harmon*
**TERRY J. HARMON**
Florida Bar Number: 0029001
tharmon@sniffenlaw.com
**SNIFFEN & SPELLMAN, P.A.**
123 North Monroe Street
Tallahassee, Florida 32301
Telephone: (850) 205-1996
Facsimile: (850) 205-3004

*Attorneys for Defendants*

## <u>CERTIFICATION OF WORD COUNT</u>

The undersigned certifies on this 15th day of August 2023 that this document complies with word limits set forth in Rule 7.1(F), N.D. Fla. Loc. R., and contains 7,527 words which includes the headings, footnotes, and quotations, but does not include the case style, signature block or Certificates of Word Count and Service.

/s/ *Amy J. Pitsch*
**Amy J. Pitsch**
/s/ *Terry J. Harmon*
**Terry J. Harmon**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on this 15th day of August, 2023, a true and correct copy of the foregoing was electronically filed in the US District Court, Northern District of Florida, using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ *Amy J. Pitsch*
**Amy J. Pitsch**
/s/ *Terry J. Harmon*
**Terry J. Harmon**